IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CHRISTINE STONE, | |
| Plaintiff | |
| vs. | CIVIL ACTION FILE |
| OCWEN LOAN SERVICING, LLC; | |
| BANK OF NEW YORK MELLON, N.A. (f/k/a Bank of New York, N.A., As Successor in Interest to JPMorgan Chase Bank, N.A., Trustee for the Certificate-Holders of Popular, ABS, Inc. Pass-Through, Certificates Series 2005-2), | No. _____ |
| | Request for  Appointment of Special Master |
| Defendants | ***JURY TRIAL DEMANDED*** |

## COMPLAINT

COMES NOW, Plaintiff, Christine Stone, by and through her legal counsel, and files her complaint against defendants as follows:

I.            <u>JURISDICTION AND VENUE</u>

1.

Plaintiff brings this action to recover treble damages, and costs of suit and reasonable attorneys' fees, resulting from the Defendants' and their Co-Conspirators' violations of the Sherman Act, 15 U.S.C. §§ 1-2.

2.

This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

3.

Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants resides in, is licensed to do business in, is doing business in, had agents in, is found in or transacts business in this District.

4.

The activities of Defendants and their Co-Conspirators were within the flow of, were intended to, and did have a substantial effect on the interstate commerce of the United States.

5.

This Court has in *personam* jurisdiction over each of the Defendants because, inter alia, each Defendant:

(a)     transacted business throughout the United States, including in this

District,

(b) issued, refinanced, offered, purchased and resold notes and mortgages secured by 1-4 unit residential properties throughout the United States including in this District,

(c) had offices in various States in the United States, including in this District, and through such offices engaged in such real estate transactions in most if not all of the States; and

(d) was engaged in an illegal scheme and conspiracy to restrain trade, participate in a group boycott and refusal to deal, and to fix the price of mortgage notes for mortgagers in an amount higher than the value of the mortgaged property; this conspiracy was directed at and had the intended effect of causing injury to homeowner-mortgagors of 1-4 unit residential dwellings located and residing throughout the United States, including in this District.

6.

The primary unlawful activity of the Defendants and Co-Conspirators has been and is to deny homeowner-mortgagors of 1-4 unit residential properties the opportunity to purchase their homes (directly or through others) in a short sale when the mortgaged property is being offered and sold through a short sale with the consent of the lender or its servicer, and not offering a defaulted note and mortgage to the homeowner-mortgagor when the note and mortgage are being offered for sale to other banks, servicers, venture capital funds, vulture funds or other third persons.

II.                                THE PARTIES

7.

Plaintiff CHRISTINE STONE, residing at 2604 Canopy Lane, Marietta, Georgia 30066, located in Cobb County, who has executed a note and mortgage secured by her residence (the "Note and Mortgage"), which are allegedly owned by Defendant Bank of New York Mellon, as trustee, with the loan serviced by Defendant Ocwen Loan Servicing, LLC.

8.

**Defendant OCWEN LOAN SERVICING, LLC** ("Ocwen"), at all times relevant, has had a headquarters and office at 2002 Summit Blvd., Atlanta, Georgia 30319, is currently servicing more than 1.3 million 1-4 unit residential mortgages throughout the United States, including the Note and Mortgage.  Their principal place of business, as shown with Georgia Secretary of State is located at 1661 Worthington Road, Suite 100, West Palm Beach, Florida  33409.  Service of Process will be perfected upon Ocwen through their Registered Agent: **Corporation Service Company, 40 Technology Parkway, South, Suite 300, Norcross, GA  30092, in Gwinnett County**.

4

9.

**Defendant  BANK OF NEW YORK MELLON, N.A.** (f/k/a The Bank of New York, N.A.,  As Successor in Interest to JPMorgan Chase Bank, N.A., Trustee for the Certificate-Holders of Popular, ABS, Inc. Pass-Through, Certificates Series 2005-2) ("BNYM"), at all times relevant, has had its headquarters at 225 Liberty Street, New York, NY 10286, and has a local office at  3290 Northside Pkwy NW #950, Atlanta, GA 30327.   BNYM purports to be the owner of the Note and Mortgage, secured by the Plaintiff's residential property.   Service of Process will be perfected upon BNYM by serving Summons and Complaint upon their Registered Agent:   **C T Corporation System, 1201 Peachtree Street, N. E., Atlanta, GA  30361, Fulton County**.

III.                       BRIEF STATEMENT OF FACTS

10.

The Plaintiff was paying the note and mortgage and was not in default, but Defendants and/or their predecessors falsely claimed Plaintiff was in default, refused to accept any monthly payments from the Plaintiff, and threatened to sell the Plaintiff's mortgaged property.

5

11.

Litton Loan Servicing, now Ocwen, declared the loan in default, with an acceleration of all unpaid monthly payments promised in the Note, ignored that the previous Note Holder/Servicer had agreed to a refinance for Plaintiff.

12.

During the period that the Plaintiff failed to make monthly payments on the Note and Security Deed, the then Note Holder, owner of the Security Deed ("SD"), offered the Note and SD to various persons, not including the Plaintiff, and sold the defaulted Note and Mortgage to one or more persons (not including Plaintiff) with BNYM becoming the present purported owner of the Note and SD.

13.

Defendants have a policy of not permitting a homeowner-mortgagor\borrower who is in default to purchase the secured property, directly or indirectly, at a short sale.

14.

Ocwen enforces this policy for each of the hundreds of lenders that it represents as loan servicer, including all of the loans owned by BNYM, CitiMortgage, Chase, Deutsche Bank and Wells Fargo that are serviced by Ocwen, and this policy is reciprocated as to any loans owned by Ocwen serviced by such other banks.

15.

The Defendants are in a continuing conspiracy with these banks (the "Co-Conspirators") to enforce this short-sale policy.

16.

Because the Plaintiff by such short-sale policy is not permitted to acquire the mortgaged property through a short sale, the Defendants and Co-Conspirators have a related policy and practice of not offering a default Note and Mortgage to the homeowner-mortgagor (including the Plaintiff) when the defaulted note and mortgage are being offered for less than the amount owed to other banks, servicers, investors, venture capital funds, vulture funds or other third persons.

17.

Purchase of a defaulted note and mortgage by the homeowner-mortgagor would be an indirect way of accomplishing a prohibited short sale to such person and therefore is not permitted by the Defendants and their Co-Conspirators.

AS AND FOR A FIRST CAUSE OF ACTION
VIOLATION OF §§ 1-2 OF THE SHERMAN ACT,
15 U.S.C.A. §§1-2 INDUSTRY-WIDE AGREEMENT NOT TO APPROVE
A SHORT SALE TO THE DEFAULTED HOMEOWNER-MORTGAGOR
(Against Both Defendants)

18.

Plaintiff repeats and realleges each of the foregoing allegations as if more fully set forth herein, and allege that the activities of the Defendants and their Co-Conspirators amount to a violation of §§ 1-2 of the Sherman Act, 15 U.S.C.A. §§ 1-2 as an industry-wide agreement among the major commercial banks and residential mortgage loan servicers (including the Defendants) not to approve a short sale (directly or indirectly) to the defaulted homeowner-mortgagor (including the Plaintiff) (the "Short-Sale Conspiracy and Agreement").

19.

By reason of the Short-Sale Conspiracy and Agreement among  the Defendants and their Co-Conspirators, which commenced prior to 2008, the Plaintiff had no opportunity to refinance her residence through purchasing it in a short sale based on the value of the mortgaged property, which was substantially lower in amount than the amount Defendants claimed due on the defaulted Note and Mortgage, whereas the Defendants were able to purchase the Note and Mortgage for less than the amount allegedly owed by the Plaintiff.

20.

This Short-Sale Conspiracy and Agreement is a violation of the federal antitrust laws (i.e., the Sherman Act), as discussed below, because the short-sale purchaser would be required by the agreement to sign an affidavit attesting to an "arm's length" transaction and represent to the Defendants that the Plaintiff is not going to wind up living in the mortgaged property or having an interest in the mortgaged property after completion of a short sale to the Plaintiff.

21.

As a result of this alleged agreement, combination and conspiracy in restraint of trade, the Defendants did not offer the Plaintiff the opportunity while the Note and Mortgage were in default of buying her residence through a short sale (or the opportunity of buying the defaulted Note the Defendants' predecessors were, upon information and belief, offering to the Defendants investors and/or others at a discount, as the equivalent of a short sale).

22.

The major banks and their servicers by this alleged industry-wide agreement exclude any opportunity for homeowners to remain in their property when the secured note owner conveys its interest in the note and mortgage, either through a short sale of the mortgaged property or through selling the defaulted note for less

than the amount owed.  There is no economic justification for the industry-wide agreement not to allow short sales to the defaulted homeowner (or the failure to offer the defaulted note to the homeowner when the lender is offering the defaulted note to vulture funds, other venture capital funds, other banks, investors or others).

23.

These activities are a violation of the Sherman Antitrust Act (15 U.S.C.A. §§ 1-2), as a boycott and conspiracy or agreement in unreasonable restraint of trade and monopolizing the market through a combination of banks and servicers often acting in concert through Mortgage Electronic Registration Systems, Inc. or "MERS" and through buying and selling notes and mortgages among themselves through Pooling and Servicing Agreements and Trust Indenture agreements having substantially similar provisions, with leading loan servicers implementing the agreement when servicing notes and mortgaged owned by the nation's leading banks.

24.

Defendants do not make these loss mitigation techniques (of short sale and purchasing a defaulted note and mortgage) available to the homeowners-mortgagors during any required state or local mediation procedures, and this action is to recover damages for the Defendants' failure to provide these loss mitigation

options to the Plaintiff during the foreclosure process as to Plaintiff's residence taking place at this time under Georgia law, and at all other times when the Defendants or their predecessors in interest were offering the defaulted Note to Defendants or any third persons.

25.

25. The relevant market for these alleged restraints are 1-4 family residential securitized mortgages in default or alleged default, and the relevant sub-markets are:

    1.    Short sales of the mortgaged property;

    2.    Sales of the defaulted note and mortgage as an indirect way of purchasing the mortgaged property;

    3.    Loan modification or forbearance agreements; and

    4.    Refinancing of the mortgaged property with other financial institutions.

26.

As background, about two million securitized 1-4 family residential mortgages are being or have been foreclosed and the mortgaged property sold for its present (often substantially reduced) value or less, with the homeowner being forced to lose his/her home because of industry-wide restrictions on homeowners-mortgagors preventing the homeowner from participating in short-sale purchase of his/her property or defaulted note and mortgage.

27.

Also, the notes and mortgages, after going into default, are being sold to hedge funds, vulture funds and investors for commencement of foreclosure proceedings, followed by sale of the mortgaged property and eviction of the former homeowner-mortgagor from the mortgaged premises.

28.

The antitrust problem is that by private agreement among lender, servicer and trustee, set up by the nation's major banks and servicers (including Defendants, upon information and belief) during the mortgage securitization process, the homeowner-mortgagor is never permitted to buy the note and mortgage when they are being offered for sale and sold (i.e., assigned) and then re-assigned, even during any state or local mediation process in which all loss mitigation options should be available to the homeowner-mortgagor involved in a foreclosure proceeding. The Defendants and their Co-Conspirators knowingly fail in their duty to advise the homeowner-mortgagor of his/her full range of loss mitigation options, thereby causing many of them to lose their homes in the foreclosure process. Mediation negotiations should include a look at the possibility of selling the note and mortgage to the homeowner-mortgagor for the net present value ("NPV") of

the note and mortgage (i.e., the amount which the lender would realize upon the foreclosure sale it was seeking to approve), but this did not and does not occur with these Defendants when pursuing their foreclosure proceedings against the Plaintiff.

29.

As a result of the securitization agreements among the mortgagee, underwriter, trust, trustee and servicer, the homeowners (including the Plaintiff) are stuck with the bank's or servicer's refusal during any required mediation process to grant an affordable loan modification and cannot get another bank or person to lend against the mortgaged property (at its present reduced value) to enable the homeowner to refinance the mortgage (with an affordable monthly payment at the present, often a lower rate of  interest) and remain as owner and occupant of the home. The illegal activities of the Defendants prevented the Plaintiff from changing lenders and from obtaining a loan with a lower principal amount (which is a price-fixing charge, as well as a monopolization charge).

30.

This is a serious (but readily curable) antitrust law violation, involving an unlawful combination of banks and servicers (including Defendants) setting up these prohibitions in the documents used for securitization of about two-thirds of the nation's residential mortgage loans, including the instant mortgage, in unreasonable

13

restraint of trade in violation of §§ 1-2 of the Sherman Antitrust Act, 15 U.S.C.A. § 1-2.

31.

Plaintiff is not alleging that securitization is illegal.  Instead, Plaintiff is alleging that in connection with securitization some antitrust violations are occurring that can and should be enjoined and/or compensation for existing injuries paid, so that securitization of mortgages can continue without such violations.

32.

The securitization process includes some agreement provisions in unreasonable restraint of trade.  It is also a boycott and group boycott because the banks, servicers and REMIC (securitization) trustees do not allow any sale of the note and mortgage to the homeowner.  Also, it is a conspiracy and combination in unreasonable restraint of trade when those provisions with antitrust violations are included.

### *Examples of the Illegal Provisions:*

33.

The industry-wide agreement is found in the short-sale affidavits required by the major banks and major servicers (including Defendants), and by Fannie Mae and Freddie Mac.  The following are provisions contained in the short sale letters or

affidavits for some of the nation's leading banks and their servicers, including Defendant Ocwen (which, as service for Defendant NYBM and hundreds of other lenders, implements the alleged agreement in violation of the Sherman Act):

OCWEN, SETERUS & GMAC (*all contain identical verbiage)

"There are no agreements, understandings or contracts between the Seller(s) and Buyer(s) that the Seller(s) will remain in the Property as tenants or later obtain title or ownership of the Property, except that the Sellers(s) are permitted to remain as tenants in the Property for a short term, as is common and customary in the market but no

longer than ninety (90) days, in order to facilitate relocation."

Source: http://www.nevadashortsaleinfo.com/-----home.asp

BANK OF AMERICA

"The Parties acknowledge and agree that neither the Buyers nor the Sellers nor their respective Brokers/Agents have any agreements written or oral that will permit the Seller or the Seller's family member to remain in the property as renters or regain ownership of said property at any time after the execution of the Short Sale transaction. This includes if the seller is retaining a direct or indirect ownership or possessory interest in the property and/or has a formal or informal option to obtain such as interest in the future."

WELLS FARGO

"Neither the Buyers, or Sellers, nor their Agents have any agreements written or implied that will allow the Seller to remain in the property as renters or regain ownership of said property at any time after the execution of this Short Sale transaction."

CHASE/JP MORGAN

"There is no agreement, whether oral, written, or implied, between the Seller and the Buyer and/or their respective agents that allows the Seller to remain in the property as a tenant or to regain ownership of the Property at any time after the consummation of this sale transaction."

CITI

"There are no agreements, understandings or contracts between the Seller(s) and the Buyer(s) that the Seller(s) will remain in the Property as tenants or later obtain title or ownership of the Property, except that the Seller(s) are permitted to remain as tenants in the Property for a short term, as is common and customary in the market but no longer than ninety (90) days, in order to facilitate relocation."

(Citi and Freddie Mac form).

INDYMAC / ONEWEST BANK

1.    The purchase and sale transaction reflected in the Agreement is an "arm's length transaction", meaning that the transaction is between parties who are independent of one another, and unrelated and unaffiliated by family, marriage or commercial enterprise, other than the purchase and sale of the Mortgage Premises between the Buyer(s) and the Seller(s) that is the specific subject of the proposed short sale as disclosed to the Servicer.

2.    There are no agreements, understandings or contracts relating to the current sale or subsequent sale of the Mortgaged Premises that have not been disclosed to the Servicer.

Source:

https://www.indymacmortgageservices.com/uploadedfiles/indymac

/manage_my_account/payment_assistance/sspackage.pdf

16

SELECT PORTFOLIO SERVICING (SPS)

WHAT IS THE SELECT PORTFOLIO SERVICING SHORT SALE PROCESS?

The lender acknowledges receipt of the file. (This can take 10 to 30 days.)

A negotiator is assigned. (This can take 30 to 60 days.)

A Brokers Price Option (BPO) is ordered. (This can take 10 to 15 days.)

A second negotiator could be assigned. (This can take another 30 days.)

The file is sent for review or to the PSA. (This can take 15 to 30 days.)

The bank might request that all parties sign an Arm's-Length Affidavit.(Typically notarized) [sic]

The bank issues a short sale approval letter.

Close the sale of your short sale

Source: https://nationalshortsaleexperts.com/Select-Portfolio-Servicing

FANNIE MAE

(a)   The sale of the Property is an "arm's length" transaction, between Seller(s) and Buyer(s) who are unrelated and unaffiliated by family, marriage, or commercial enterprise;

(b)   There are no agreements, understandings or contracts between the Seller(s) and Buyer(s) that the Seller(s) will remain in the Property as tenants or later obtain title or ownership of the Property, except that the Sellers(s) are permitted to remain as tenants in the Property for a short term, as is common and customary in the market but no longer than ninety (90) days, in

17

order to facilitate relocation;

DEUTSCHE BANK

In an action entitled DEUTSCHE BANK NATIONAL TRUST COMPANY, as trustee for the registered holders of Morgan Stanley ABS Capital I, Inc. Trust 2007-HE7 mortgage pass through certificates, series 2007-HE7, Plaintiff-Appellee, v. AINA ADEGBEMI, 2014 IL App (1st) 133484-U (Ill. App., 1st Div. 2014), the following statement was made in the Court's opinion:

Attached was an original pen-signed "Affidavit of 'Arms-Length Transaction' " which certifies that Adegbemi and the buyer had no agreements, written or implied, that would allow Adegbemi to remain at the property as a renter or regain ownership after the short sale.

FREDDIE MAC

In addition, the Servicer must obtain a short sale affidavit wherein the parties to the transaction attest that the sale constitutes an "arm's length" transaction. An "arm's length transaction" is a transaction between parties who are independent of one another, and unrelated and unaffiliated by family, marriage or commercial enterprise, other than the purchase and sale of the Mortgaged Premises between the Borrower(s) and the purchaser(s) that is the specific subject of the proposed short sale as disclosed to the Servicer. This affidavit is to be executed before or at the time of closing of the sale of the Mortgaged Premises by all Borrower(s), purchaser(s), real estate brokers representing any of the parties, the escrow/closing agent performing the closing of the sale, and the transaction facilitator facilitating the sale (if any) certifying under penalty of perjury that to the best of each signatory's knowledge and belief:

(a)   The sale of the Mortgaged Premises is an "arm's length"

transaction, between parties who are unrelated and unaffiliated by family, marriage, or commercial enterprise;

(b)   There are no agreements, understandings or contracts between the parties that the Borrower will remain in the Mortgaged Premises as a tenant or later obtain title or ownership of the Mortgaged Premises, except to the extent that the Borrower is permitted to remain as a tenant on the Mortgaged Premises for a short term, as is common and customary in the market but no longer than ninety (90) days, in order to facilitate relocation;

CENTRAL MORTAGE COMPANY

Allows you to sell your property for less than what is owed to satisfy your debt if approved by the investor. Beneficial if your property value has decreased. Must have a licensed realtor and be an "arms-length transaction."

[End of Arm's Length Examples.]

34.

Defendants will not allow offers or sales to the Plaintiff as described above because of the industry-wide agreement among the nation's mortgagees and trustees of pooled 1-4 family residential mortgages prohibiting the mortgagors from purchasing the note and mortgage, even in a foreclosure action, to save their home from foreclosure.  Failure to abide by this private, industry-wide restriction could cause FNMA, Fannie Mae or some other large company to refuse to deal with a lender or trustees or attorneys that fail to abide by this private rule.

35.

The restriction prohibiting Plaintiff and other homeowners-mortgagors from buying the note and mortgage when others are permitted to buy the note and mortgage is directly related to the short sale prohibition, in which the homeowner (or his immediate family or business associates or friends) is/are not allowed to buy her home through a "short sale", even though the mortgagee would be willing to permit a sale of the home to anyone else in the world.

36.

These restrictions upon continued ownership or occupancy after a short sale approved by the mortgagee or its servicer are the basis for not offering the defaulted note and mortgage to the mortgagor, which would be the substantial equivalent of a prohibited short sale to the homeowner-mortgagor.

37.

Furthermore, the banks are monopolizing the foreclosure sales market for 1-4 family residential homes by not permitting sale of the defaulted note and mortgage to the homeowner for its current value (thus preventing any refinancing with another bank based on present value and present interest rate), which is also monopolizing the submarket of refinancing of residential home mortgages in foreclosure, which results in fixing the defaulted note at a higher amount than the

value of the mortgaged property, but only as to the mortgagor.

38.

38. The Plaintiff has a right to purchase the defaulted Note and Mortgage for the Net Present Value, which is the full amount that the Defendants (assuming they owned the Note and Mortgage) could obtain through foreclosure sale of the mortgaged property.  This alleged right of the Plaintiff is attributable to the Sherman Antitrust Act, because not allowing the Plaintiff to either do a short sale herself [or purchase the defaulted note and mortgage when the Defendants are willing to sell the defaulted note and mortgage to various vulture funds or other type of hedge fund or investor] under these circumstances is an unlawful group boycott and unreasonable restraint in trade and monopolizing created by conspiracy, combination and agreement involving the Pooling and Servicing Agreement and the Trust Indenture agreement with their mortgage insurance requirements.

39.

The Plaintiff seeks disclosure of any and all offers of the defaulted note and mortgage that Defendants have made from the date of Plaintiff's alleged default to the date of any auction sale of the mortgaged property.

40.

Also, Plaintiff requests an order declaring that any provisions in the Pooling and Servicing Agreement and/or Trust Indenture agreement which prohibit a sale of the note and mortgage to the Plaintiff, or for refinancing, including the mortgage insurance requirement, as described above, are illegal, null and void under §§ 1-2 of the Sherman Antitrust Act.

41.

The Plaintiff has been damaged by the activities of the Defendants, their predecessors, servicers, and successor(s), by their agreeing to a set of rules set forth in the uniform terms of the Pooling and Servicing Agreements and Trust Indenture agreements that permit short-sale of the home or sale of a defaulted note and mortgage to anyone but the homeowner-mortgagor (or relatives or business associates). These unlawful restraints have resulted in the threatened loss of Plaintiff's home with irreparable damages, as well as monetary damages and attorneys' fees.

42.

The Plaintiff is entitled to an award of her actual, including consequential, damages, such as caused by a reduced credit rating, higher interest rates, costs of seeking alternatives, higher prices because of lower borrowing opportunities,

relocation costs, attorneys' fees in other litigation as against each of the named Defendants.

43.

The Plaintiff is entitled to treble damages plus attorneys fees under the Clayton Act, 15 U.S.C.A. § 15, as against each of the named Defendants.

44.

The Plaintiff is threatened with irreparable injury through the loss of her home, and the Plaintiff is entitled to a judgment vacating any sale and any re-sales of the mortgaged property and returning any lost possession and title to the Plaintiff.

AS AND FOR A SECOND CAUSE OF ACTION
VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C.A. § 1
INDUSTRY-WIDE AGREEMENT NOT TO OFFER OR SELL A
DEFAULTED NOTE AND MORTGAGE TO THE DEFAULTED
HOMEOWNER-MORTGAGOR
(Against Both Defendants)

45.

Plaintiffs repeat and realleges each of the foregoing allegations as if more fully set forth herein, and allege that the activities of the Defendants amount to a violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1 as an industry-wide agreement not to offer or sell a defaulted note and mortgage to the defaulted homeowner-mortgagor.

46.

46. The industry-wide agreement, practice and custom and usage of denying a defaulted homeowner the opportunity to buy the defaulted note and mortgage when they are being offered to hedge funds, vulture funds, investors, banks, servicers and others is a violation of § 1 of the Sherman Act.

47.

Damages and requests for relief are set forth at ¶¶ 41-44 above.


AS AND FOR A THIRD CAUSE OF ACTION
VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C.A. § 1
INDUSTRY-WIDE AGREEMENT REQUIRING MORTGAGE INSURANCE
THAT DENIES COVERAGE WHEN A DEFAULTED MORTGAGE DOES
NOT LOSE HIS OWNERSHIP AND OCCUPANCY
(Against Both Defendants)

48.

Plaintiff repeats and realleges each of the foregoing allegations as if more fully set forth herein, and allege that the activities of the Defendants amount to a violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1  as an industry-wide agreement requiring mortgage insurance that denies coverage in a mortgage default when a defaulted mortgagor does not lose his ownership and occupancy of the mortgaged property.

49.

The industry-wide agreement, practice and custom and usage (in the securitization of 1-4 family residential mortgages) requiring mortgage insurance that denies coverage to the note owner, when the defaulted mortgagors (including the Plaintiff) do not lose their ownership and occupancy in a foreclosure, is a violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1.

50.

Damages and requests for relief are set forth at ¶¶ 41-44 above.

## PRAYER

WHEREFORE, the Plaintiff prays the Court for the following relief against the Defendants, all of which (for purposes of brevity and accuracy is incorporated by reference:

a)     For the First Cause of Action - the relief described in ¶¶ 41- 44;

b)     For the Second Cause of Action - the relief described in ¶¶ 41- 44;

c)     For the Third Cause of Action - the relief described in ¶¶ 41- 44;

d)     As to all Three Causes of Action:  Costs, pre-judgment interest, treble damages, attorney's fees, and such other and further relief which this Court deems just and proper.

<u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury of all issues triable by right of jury.


Respectfully submitted this <u> 22 </u> day of <u>February</u>, 2017


By: <u>/s/ Sam Levine_____</u>
Sam Levine, Attorney for Plaintiff
Georgia Bar No: 448738
1014 Havenridge Lane, NE
Atlanta, Georgia  30319
Tel. (404) 841-7090